JS-6

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ADAM NAIL,<br><br>      Plaintiff,<br><br>v.<br><br>LENS.COM, INC.,<br><br>      Defendant. | Case No. 2:24-cv-02531-SB-E<br><br>ORDER GRANTING DEFENDANT'S MOTION TO TRANSFER VENUE [DKT. NO. 24] |

      Defendant Lens.com, Inc. is an online retailer that sells contact lenses. Plaintiff Adam Nail, who purchased two boxes of contact lenses through Defendant's website, brings this consumer class action alleging that Defendant misleads consumers by charging hidden fees that increase the price of the contact lenses to 50 to 80 percent above the advertised price. Defendant moves to transfer this case to the U.S. District Court for the District of Nevada pursuant to a forum-selection clause included in the terms and conditions of use of its website (the Terms of Use) or, alternatively, to dismiss the case based on Plaintiff's assertion of only California consumer-protection claims despite the Nevada choice-of-law provision in the Terms of Use. Because Plaintiff agreed to a contractually valid forum-selection clause, and because no extraordinary circumstance exists that would warrant not enforcing the clause, Defendant's motion to transfer is granted.

I.

      Plaintiff filed this consumer class action alleging claims against Defendant for false and misleading advertising of its contact lenses under California's False Advertising Law (FAL), Consumer Legal Remedies Act (CLRA), and Unfair Competition Law (UCL). Dkt. No. 1.

Defendant is an online retailer that sells contact lenses through its website. Dkt. No. 1-1 ¶ 11. To attract customers, Defendant advertises online and prominently displays the prices of its contact lenses in its advertisements. *Id*. If a user clicks on Defendant's advertisement, the user is taken to Defendant's website, where the price of the contact lenses matches the advertised price. *Id*. ¶¶ 15–16. To continue through the purchasing process, the user clicks through multiple pages where he is required to provide various information. On each page, the user is required to click a button, which typically says "Continue" (or something similar), to proceed to the next webpage. *Id*. at 5–9. On the fourth page, the user is prompted to either "Continue Shopping" or "Checkout." *Id*. at 6. If the user chooses to checkout, he is asked on the fifth page to either sign in or enter his address for shipping information. *Id*. at 7; Dkt. No. 28 at 11.

On the fifth page, just below the "Continue" button, is a hyperlinked notice stating: "By continuing you agree to our Terms of Use & Privacy Policy." Dkt. No. 24 at 4, Dkt. No. 28 at 11. If the user scrolls past this "Continue" button without clicking it, there is an "Order Summary" that lists the taxes and fees applied. Dkt. No. 1-1 ¶ 22. These taxes and fees can increase the amount owed to 50 to 80 percent above the advertised price. *Id*. ¶ 27. Below the fees is a "Go To Checkout" button, directly beneath which is another hyperlinked notice of the Terms of Use identical to that beneath the "Continue" button. *Id*. at 7–9. The user must click either the "Continue" button or "Go to Checkout" button to continue to the sixth and final page of the ordering process. On the sixth page, the consumer is shown an order summary that makes no reference to the taxes and fees but provides a total cost, which includes the taxes and fees. *Id*. ¶ 21.

On January 2, 2021, Plaintiff purchased two boxes of contact lenses, each advertised at a price of $17.99 (for a total of $35.98). *Id*. ¶ 28–29. After accounting for shipping charges, Plaintiff paid an additional $28.78 in taxes and fees. *Id*. ¶ 29. Nearly two years later, Plaintiff purchased another two boxes of contact lenses, each of which was advertised at a price of $51.74 (for a total of $103.48). *Id*. ¶ 30. For this purchase, Plaintiff paid $49.47 in taxes and fees. *Id*.

Plaintiff brings this putative class action alleging violations of the CLRA, FAL, and UCL on behalf of himself and a putative class, which he defines as:

> All consumers who, within the applicable statute of limitations preceding the filing of this action to the date of class certification, purchased products from Defendants and were assessed a higher price than represented in advertisements and on Defendants' website.

*Id.* ¶ 31.[1]

Defendant now moves to transfer this case to the District of Nevada based on a forum-selection clause in the Terms of Use.  In relevant part, the Terms of Use state:

> These Terms and Conditions of Use shall be governed by and construed in accordance with the laws of the State of Nevada, without regard to choice of law rules.  Any litigation arising out of or in connection with the use of this site shall be exclusively venued in state or federal courts located in Clark County, Nevada, with you and Lens.com waiving the right to trial by jury, agreeing that each party to litigation shall bear its own attorney's fees and costs, and waiving any objections to personal jurisdiction and the appropriateness of this venue, including those arising under the doctrine of forum non conveniens.

Dkt. No. 24 at 2.  Defendant also moves to dismiss Plaintiff's complaint pursuant to Rule 12(b)(6).  Because the Court determines that this case should be transferred to the District of Nevada, it does not decide the motion to dismiss.

## II.

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a).  Section 1404(a) is a codification of the forum non conveniens doctrine and is the appropriate mechanism for enforcing a forum-selection clause.  *Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49, 59–61 (2013).  A valid forum-selection clause is "given controlling weight in all but the most exceptional cases." *Id.* at 63.

Federal law determines the "enforceability of the forum selection clause." *Doe 1 v. AOL LLC*, 552 F.3d 1077, 1083 (9th Cir. 2009).  Such a clause is "presumptively valid," and the party challenging its validity bears a "heavy

---

[1] The parties appear to dispute whether this case involves a California or nationwide class.  Although the complaint asserts only violations of California law, the class definition does not limit its reach to California consumers.  The Court need not and does not decide this dispute, however, in ruling on this motion.

burden" to establish that the clause is unenforceable. *Id*. A forum-selection clause is invalid where "enforcement would contravene a strong public policy of the forum in which suit is brought." *Id.* (quoting *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972)).

III.

A.

Before determining the effect of the forum-selection clause, the Court first addresses its validity. The parties agree that state law determines the validity of the forum-selection clause. Based on this agreement, the Court will apply state law without deciding its applicability. The parties disagree, however, about whether California or Nevada law applies. Because the parties agree that the result is the same under both bodies of law, Dkt. No. 30 at 2–3, the Court applies California law as a matter of convenience without deciding which law controls. *See Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 855 (9th Cir. 2022) ("As in *Nguyen*, we need not decide which State's law governs because both California and New York law dictate the same outcome.") (cleaned up).

In internet transactions, the party seeking to enforce a forum-selection clause must show that the nonmoving party had either actual or constructive notice of the terms and conditions. *See Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 512 (9th Cir. 2023) (applying California and Massachusetts law); *see also Hauff v. Heward*, No. A-20-cv-809538, 2020 Nev. Dist. LEXIS 595, *12–13 (D. Nev. 2020) (addressing Nevada law). Generally, there are four types of agreements used by websites: clickwrap, scrollwrap, browserwrap, and sign-in wrap agreements. *See Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005, 1014 (9th Cir. 2024). Clickwrap agreements present website users with contractual terms on a pop-up screen and require users to click to continue, thereby taking an action indicating agreement with those terms. *Berman*, 30 F.4th at 856. Such agreements are generally enforceable. *Id*. Scrollwraps go a step further and require the user to scroll through the terms of use before clicking a consent box. *See Keebaugh*, 100 F.4th at 1014. Like clickwraps, scrollwraps are also generally enforceable. *Id*. Browserwrap agreements are at "the other end of the spectrum." *Berman*, 30 F.4th at 856. In these agreements, a hyperlink to the terms is located somewhere on the webpage—typically at the bottom—and continued use of the website purports to constitute assent by the user. *Id*. Courts are reluctant to enforce such agreements. *Id*. In the middle of the spectrum is a sign-in wrap agreement, which may be enforceable where "(1) the website provides reasonably conspicuous notice

of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Keebaugh*, 100 F.4th at 1014 (quoting *Berman*, 30 F.4th at 856). Whether the parties have expressed mutual assent in such an agreement is determined "under an objective reasonableness standard." *Oberstein*, 60 F.4th at 513.

1.

The first prong of this test considers both the visual placement of the notice and the context of the transaction. *See Keebaugh*, 100 F.4th at 1019–20. The Court analyzes each in turn.

a.

With respect to the visual placement, constructive notice of a sign-in wrap agreement must be reasonably conspicuous, which requires that the notice "be displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it." *Oberstein*, 60 F.4th at 515 (citations omitted). In analyzing this prong of the test, courts look to "the conspicuousness and placement of the 'Terms of Use' hyperlink, other notices given to users of the terms of use, and the website's general design." *Id*.

In this case, the conspicuous placement and contrasting font color of the hyperlink, and general design of the website provide adequate notice to a reasonably prudent internet user. Plaintiff states in his declaration that he made the purchases using either his computer or his iPhone. Dkt. No. 28-6 ¶ 4. An image of the website as seen on a computer screen or iPhone is reproduced below.[2] *See* Dkt. No. 28 at 11, Dkt. No. 30 at 5–7.

---

[2] Both images have been reduced in size from what a user would see on an iPhone 12 (or more recent variant with the same size screen) or 16-inch laptop computer.





The determination of whether notice is conspicuous is a "fact-intensive inquiry." *See Oberstein*, 60 F.4th at 514 (discussing the fact-intensive inquiry applied under California law). A review of the website on both a computer and an iPhone demonstrates the conspicuous nature of the Terms of Use hyperlink. First, the Terms of Use hyperlink is presented in black font against a white background—the same contrast as the rest of the writing on the page. *See Keebaugh*, 100 F.4th at 1020–21 (addressing the "contrasting font color" of white font on a dark background); *see also Slaten v. Dick's Sporting Goods, Inc.*, No. 2:22-CV-09366-WLH, 2024 WL 1136399, at *4 (C.D. Cal. Feb. 2, 2024) (finding that the notice of terms was conspicuous when it was in black, underlined font). Second, the Terms of Use hyperlink is presented directly below a bright red button that the user of the website is required to identify and click to continue to the subsequent step in the ordering process. *See Oberstein*, 60 F.4th at 516 ("Appellees' notice is conspicuously displayed directly above or below the action button . . ."); *see also Keebaugh*, 100 F.4th at 1020 (finding that visual placement was clear when the notice of terms was "[d]irectly beneath the operative Play button"). Third, the overall webpage design as it appears on the computer and phone is uncluttered and places the Terms of Use hyperlink sufficiently close to the "Continue" or "Go To Checkout" buttons while offsetting it with enough white space for it to stand out. *See Keebaugh*, 100 F.4th at 1021 (identifying that the webpage "lacks clutter and uses customary design elements denoting the existence of a hyperlink") (cleaned up). Finally, when a user hovers the mouse over the Terms of Use hyperlink, the font turns red, further causing it to stand out.

Plaintiff focuses on the fact that the hyperlinks are black and underlined instead of being a bright blue color. While "[s]imply underscoring words or phrases . . . will often be insufficient," *Berman*, 30 F.4th at 857, this is not always the case, *see Keebaugh,* 100 F.4th at 1020–21. In *Keebaugh*, the hyperlinks were the same color as the font on the rest of the page (i.e., white). 100 F.4th at 1010–11. The Ninth Circuit nevertheless found that the hyperlinks were conspicuous, noting that the color of the hyperlinks contrasted with the background of the remainder of the page, the terms-of-use hyperlink was directly beneath the "operative Play button," and the webpage was uncluttered. *See also Patrick v. Running Warehouse, LLC*, 93 F.4th 468, 477 (9th Cir. 2024) ("That the links are not blue, underlined, or capitalized does not undercut the district court's conclusion that Running Warehouse provided [the plaintiff] with 'reasonably conspicuous notice' of the Terms."). This case is similar. Although the hyperlinks are the same color as the font on the rest of the page, the black font stands out against the white background, the Terms of Use hyperlink is directly beneath the continue button, and the webpage is largely uncluttered. Moreover, other hyperlinks on the fifth

page—and throughout the purchasing process—are underlined in black font, indicating that this is the "customary design element[] denoting the existence of a hyperlink" on Defendant's website.  *Id*. at 1021 (cleaned up).  During oral argument, Plaintiff emphasized that the Terms of Use were presented only on page five of the purchasing process.  But the fifth page is the first page that begins the actual checkout.  On page four, the user must choose to either "Continue Shopping" or "Go To Checkout."  Dkt. No. 1-1 at 6.  Thus, the user is presented with the Terms of Use after choosing to checkout.  Plaintiff has not shown that this is an unreasonable placement of those terms.

Plaintiff also relies on this Court's prior decision in *Serrano v. Open Rd. Delivery Holdings, Inc.*, 666 F. Supp. 3d 1089 (C.D. Cal. 2023).  But this case is factually distinguishable.  *See Oberstein*, 60 F.4th at 514 (stating that the inquiry is fact-intensive).  In *Serrano*, the Court determined that notice of the Terms of Use was inconspicuous because:  the font size was smaller than the rest of the font; the font was a lighter tone that blended into the white background, especially when contrasted with the rest of the text on the page, which was black; the terms of use hyperlink was not adjacent to the "Sign Up" button that the user was required to click; and the hyperlinks were not in blue or any other color that stood out.  *Id*. at 1096.  Unlike in *Serrano*, the font size in this case, although smaller than the surrounding text, is not "so small that it is barely legible to the naked eye." *Berman*, 30 F.4th at 856–57.  Instead, the font is large enough for a user to identify and read the notice of the Terms of Use.  *See Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 78 (2d Cir. 2017) (applying California law and determining that the notice was conspicuous despite the "small font" because the font contrasted with the background and was in blue and underlined font); *see also Karim v. Best Buy Co.*, No. 22-CV-04909, 2023 WL 3801909, at *4 (N.D. Cal. June 2, 2023) (collecting cases where notice was conspicuous despite the font size being smaller than the surrounding print).  And as discussed, unlike the lighter font in *Serrano*, the black font here is in sharp contrast to the white background.  In short, the dark font directly beneath the "Continue" button on the uncluttered, white background of the webpage "is conspicuous and puts the reasonable user on notice that they are agreeing to be bound by the Terms of Service." *Keebaugh*, 100 F.4th at 1021.

Thus, the visual notice "puts a reasonable user on notice that they are agreeing to be bound by the Terms of Service."  *Id*.

8

b.

The Court next addresses the context of the transaction. Here, the context of the transaction supports the conspicuousness of the notice of the Terms of Use. In *Oberstein*, the Ninth Circuit determined that the context of the transaction supported a determination that the notice was conspicuous where the user was presented with the terms and conditions "when creating an account, signing into an account, and completing a purchase." 60 F.4th at 515. Purchasing a product, unlike a free trial, contemplates "some sort of continuing relationship," especially as it would relate to the purchase itself. *Id*. at 517. This is even more true when the purchase is made for a consumable item—such as contact lenses—where repeat purchases are likely to occur given the general disposable nature of the good. Indeed, Plaintiff himself, made multiple visits to the website, making purchases on two separate occasions, during each of which he was required to go through the "extensive order process." Dkt. No. 1-1 ¶ 29. Moreover, Plaintiff does not argue that such an ongoing arrangement caught him by surprise; on the contrary, he admits that he regularly agrees to be bound by such terms when he uses other websites. *See* Dkt. No. 28-6 ¶ 7 ("Typically, when I agree to be bound by the terms of use for a website . . .").

Thus, both the visual notice and the context of the transaction support a finding that the notice is conspicuous.

2.

The second prong of the constructive notice test analyzes "whether the user took some action that unambiguously manifested the user's assent to the agreement." *Oberstein*, 60 F.4th at 517. Here, users are expressly alerted that, by continuing with the purchase, they "agree to our Terms of Use & Privacy Policy." Dkt. No. 28 at 11. "As the *Berman* court emphasized, that is all that is required." *Oberstein*, 60 F.4th at 517. (finding the analysis "straightforward" where the user was alerted that by continuing, the user "agrees to our Terms of Use").

Because Defendant's website provides conspicuous notice of the terms to which the user agrees, and because a user making a purchase must unambiguously assent to those terms, the forum-selection clause in the Terms of Use is valid.

B.

Having determined that the forum-selection clause is valid, the Court next analyzes its enforceability. "When the parties have agreed to a valid forum-

9

selection clause, a district court should ordinarily transfer the case to the forum specified in that clause." *Atlantic Marine*, 571 U.S. at 62. A motion to transfer based on such a clause should only be denied under "extraordinary circumstances unrelated to the convenience of the parties." *Id*. When determining whether to transfer a case, courts typically weigh relevant public-interest considerations and the convenience of the parties. *Id*. However, where a valid forum-selection clause exists, "the plaintiff's choice of forum merits no weight," the court "should not consider arguments about the parties' private interests," and the normal choice of law rules do not apply. *Id*. at 63–64; *see also Yei A. Sun v. Advanced China Healthcare, Inc.*, 901 F.3d 1081, 1088 (9th Cir. 2018) ("While a court may consider factors relating to the public interest (such as 'the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; [and] the interest in having the trial of a diversity case in a forum that is at home with the law,' those factors will rarely defeat a transfer motion.") (cleaned up). A valid "forum-selection clause [should be] given controlling weight in all but the most exceptional cases." *Id*. at 59–60. This is not an exceptional case.

Extraordinary circumstances or exceptional reasons to find that a forum-selection clause is invalid can be found where: "(1) the clause is invalid due to fraud or overreaching, (2) enforcement would contravene a strong public policy of the forum in which suit is brought, whether declared by statute or by judicial decision, or (3) trial in the contractual forum will be so gravely difficult and inconvenient that [the litigant] will for all practical purposes be deprived of his day in court." *Sun*, 901 F.3d at 1088 (cleaned up).

Plaintiff does not assert any of the above-listed grounds for invalidating the forum-selection clause. Instead, he largely argues that the private-interest factors warrant the denial of the request to transfer. But these factors are deemed irrelevant under *Atlantic Marine* where, as here, a valid forum-selection clause exists. Nor do any of the arguments raised in support of the private-interest factors establish that trial would be "so gravely difficult and inconvenient" that Plaintiff would be deprived of his day in court if he were forced to litigate in Nevada. Plaintiff further asserts that this Court—a California court—would have greater familiarity with California law than a Nevada district court. But "federal judges routinely apply the law of a State other than the State in which they sit." *Atlantic Marine*, 571 U.S. at 67. And Plaintiff identifies no "exceptionally arcane" features

of California's consumer protection laws that "are likely to defy comprehension by a federal judge sitting in" Nevada. *Id*. at 68.[3]

Because the Court "must deem the private-interest factors to weigh entirely in favor of the preselected forum," *id*. at 64, and because the public factors do not rise to the level of an extraordinary or exceptional case, the forum-selection clause is enforceable. Transferring the case based on that clause is therefore appropriate.

## IV.

The parties entered into a contract that contains a valid forum-selection clause. Plaintiff identifies no extraordinary circumstances that warrant rejection of that clause. Accordingly, the motion to transfer is granted. The case is hereby transferred to the United States District Court for the District of Nevada.

Date: June 20, 2024

                                                Stanley Blumenfeld, Jr.
                                                United States District Judge

---

[3] Although the CLRA has an antiwaiver provision, such a provision does not necessarily preclude transferring the case to a different forum. *See Sun*, 901 F.3d at 1090 ("[A]n antiwaiver provision, without more, does not supersede the strong federal policy of enforcing forum-selection clauses."). Here, Plaintiff does not raise the antiwaiver provision, much less assert that the forum-selection clause contravenes California public policy. Thus, the antiwaiver provision does not bar transferring this case to Nevada.